Good morning, Your Honor. Ashley Wilmes, representing the plaintiff-appellant WildEarth Guardians. With me at council table is Sarah McMillan. I plan to reserve five minutes for rebuttal. May it please the Court. Guardians brought this case to require the federal agency known as Wildlife Services to comply with its obligations under the National Environmental Policy Act. Wildlife Services failed to prepare an environmental impact statement for its ongoing wildlife program, wildlife killing program in Nevada. Instead, it relied on a programmatic environmental impact statement it prepared more than 20 years ago, relying mostly on science from the 1970s and 80s. The primary issue on appeal is whether Wildlife Services can evade this Court's judicial review of its NEPA analysis and defeat Guardians' standing based on Nevada's statements in this letter. The District Court got it wrong on both the law and the facts, and for that reason we're asking the Court to find that Guardians has standing. There is no dispute that Guardians member Don Molde has demonstrated a sincere and concrete interest in Nevada's coyotes and ravens that Wildlife Services shoots, traps, and poisons, and that he recreates in the areas where Wildlife Services uses these killing methods. NEPA gives Dr. Molde a procedural right to protect these interests and seek review of Wildlife Services' uninformed decision-making. And did the District Court address Mr. Molden's? No, Your Honor. Yeah, the — excuse me, the question? Was it — did the District Court address Mr. Molden's? It addressed — we had two standing declarants, Dr. Molde and George Werthner. However, because we believe that Guardians had — that Dr. Molde has standing on all Guardians' claims, I'll focus on his declaration here today. But the District Court — the District Court didn't talk about Mr. Molde because the District Court thought that Nevada's letter defeated all of his standing, correct, on all claims? Correct, Your Honor. I don't think there was any question that he demonstrated the injury. In fact, the issue was whether his injuries were redressable based on Nevada's statements in this letter. But the District Court, I guess, didn't specifically address Mr. Molden's activity or stated interests. Yes, Your Honor. His interests in wildlife in Nevada. Yes, correct? Yes, Your Honor. Oh, okay. But it didn't — and found that there was injury, in fact. And so there's no dispute here that Dr. Molde has this concrete interest. And his injuries are redressable because requiring wildlife services to comply with NEPA may influence the agency's ultimate decision of how and where to kill wildlife in Nevada. The relief sought here is not only an injunction, which is not automatic in NEPA cases, but adequate environmental analysis. Congress enacted NEPA to require government officials to study and publicly disclose the environmental impacts of their actions. Wildlife services hasn't studied their use of toxic chemicals in traps in over 20 years. Redressability is relaxed because complying with NEPA's procedural requirements can never force an agency to make a new decision, but it will inform the agency's decision-making. For that reason, this circuit's test for redressability is whether an agency's decision could be influenced by the environmental considerations that NEPA requires the agency to study. Here, that test is easily met because a new environmental analysis may result in a decision that meets Nevada's needs but that redresses Dr. Molde's injuries. For example, if wildlife services took a hard look at the killing methods they use, wildlife services might decide not to use traps anymore in areas where Dr. Molde recreates with his dog. And then he wouldn't have to worry if his dog ran ahead on the trail about whether he might have to use the vice grips that he carries in his backpack. And that would redress the recreational injuries that he discusses in his declaration. In this letter, Nevada Department of Wildlife said that without wildlife services, it would comply with its statutory duty to manage wildlife conflicts. But there is no evidence that Nevada would intervene and kill any wildlife simply because the court ordered new NEPA analysis, or because wildlife services decided to implement a new alternative that didn't have one particular method such as traps. Say you win this lawsuit and you stop the federal government from doing its wildlife program and Nevada does come in and try to start doing everything the federal government was doing. Could you sue Nevada at that point and try to stop them with some other lawsuit? I'm not sure under what statutory authority, you know, statutory provision we would do that. Is there any reason why you couldn't or couldn't lobby Nevada to try to get them to stop at that point? No, Your Honor. And Nevada is not a party to this lawsuit. But I would also add that, you know, Nevada's future actions are really irrelevant to Dr. Molde's current injury, which are caused by wildlife services and their implementation of a federal decision to kill thousands of ravens and coyotes in Nevada, and which includes methods that wildlife services, or that, I'm sorry, that the State of Nevada cannot use. And I'd also add that wildlife services has 70 years of expertise in running this program and contributes $1.5 million in federal funding. Wildlife services considered the Nevada letter. Nevada can't, this letter cannot shield wildlife services from its obligation to comply with NEPA in this case. Wildlife services considered this letter in reaching its conclusion in the Nevada environmental assessment that it is unlikely that the state would conduct killing at the same levels without the federal program and that the killing of ravens would substantially decrease without the use of DRC-1339. And that's because Nevada employees would have to shoot ravens out of the air rather than use this very deadly toxicant that wildlife services uses to kill ravens because federal law prohibits the state from using DRC-1339. Nevada also doesn't have a permit to use M44 cyanide capsules, another lethal device that causes Dr. Molde concern when he hikes with his dog in areas where he sees signs of traps and M44s posted. The government asked this court to ignore all of this evidence and create a new heightened standard that flips the burden of proof, requiring guardians to prove a negative, that Nevada wouldn't step into wildlife services' shoes at some point in the future and start causing Dr. Molde's injuries. It relies on a line of cases where someone else is causing the injury and redressability hinges upon that non-party's discretionary response to whatever the court ordered the government to do. The plaintiff must then satisfy normal redressability standards as to the injury caused by the third party. But even in these third-party actor cases, the plaintiff doesn't have to prove that the third party would stop causing the injury. Instead, the test articulated in Utah v. Evans and Rene v. Duncan is whether there's a significant increase in the likelihood that plaintiff's injuries would be redressed. Now, this is not a third-party actor case. However, wildlife services is causing the injury and it's implementing its federal decision. However, anyway, I was just going to say that applying a more stringent burden of proof here, I think, would erode decades of this court's carefully articulated standing jurisprudence in NEPA cases since Lujan, and that includes Hall v. Norton, Salmon Spawning and Recovery Alliance, and Center for Food Safety v. Vilsack, which all apply this relaxed redressability standard in NEPA cases. But even if guardians must satisfy normal redressability standards as to Nevada and show a significant increase in the likelihood that its injuries would be redressed, it did that here. The proof was wildlife services' own conclusions in the Nevada environmental assessment that there would be a reduction in wildlife killing and that they use methods that the state cannot use. The district court ignored this evidence based on speculation as to what Nevada might do in the future, but speculation isn't enough to create standing and it shouldn't be enough to defeat it. Wildlife services also asked this court to give precedential value to an unpublished disposition involving a narrow set of facts. But this court can, and of course Goat Ranchers, but this court can and should reach a different conclusion here for three reasons. First, Goat Ranchers was wrongly decided because it ignored all of the precedent that I discussed and it was controlling precedent on the relaxed redressability requirement. Second, in Goat Ranchers someone else was causing the injury. And third, the facts are distinguishable. In Goat Ranchers, the state of Oregon had a state-run and state-funded plan to kill some cougars. And the second year, wildlife services helped them with that plan, which was the action that triggered NEPA. The court found that it was the state's cougar management plan that was causing the injury, which was the decreased chance of seeing cougars in the wild. And because the state couldn't order Oregon, or I'm sorry, the court couldn't order Oregon to stop the cougar killing, that the injuries caused by the state's plan were not redressable. But here, wildlife services is implementing a Federal decision. It's using methods the state can't use. It's spending $1.5 million a year to do it. I think the reasoning... And the state has never had its own program, right? Right, Your Honor. Let me ask you, if we were to agree with you on the standing issue, I take it your position is that we should go ahead and also decide the remaining issue, even though not decided at the district court? Is that right? The remaining issue on... Well, of course, the government says that there is no claim for causes 1 and 2. You want us to go ahead and decide that? Is that your position? Yes, Your Honor. So going back to that, then, if you look at claims 1 and 2, what is the agency action that's at issue there? Well, for the first claim, it's if the agency made a decision not to supplement the environmental impact statement. For instance, Guardians requested... Well, hypothetically, if they made that decision... Well, we don't know. There was a letter, for instance... Excuse me, Your Honor. It's just I'm having a little trouble kind of getting the concrete agency action. Sure. Well, Your Honor, Wildlife Service or, excuse me, Wild Earth Guardians submitted a request, a petition of sorts, to Wildlife Services explaining why they needed to supplement their programmatic environmental impact statement. And in response, Wildlife Services sent a letter saying, you know, we're not going to supplement, you know, the programmatic environmental impact statement. So if that letter constitutes a decision, and we don't know if it does, if that's their position, because they didn't respond to our complaint. Instead, they filed a motion to dismiss. But that's the allegation in the complaint. Right. So the second claim is the failure to supplement the programmatic environmental impact statement. And in that claim, we're saying that they had a duty to supplement. This is a 20-year-old programmatic environmental impact statement that addresses the use of toxicants, traps, M44s. It's where all of the analysis is. And, for instance, in the Nevada environmental assessment, they simply incorporated by reference all of this really stale, outdated analysis, despite all the new information before the agency. It's also a much larger program than it was years ago, now killing millions of wildlife, spending, you know, millions of dollars to do it. And the council... NEPA does give special treatment to ongoing programs. The Council for Environmental Quality, in looking at NEPA's supplementation requirement, has said that if an EIS is older than five years and it concerns an ongoing program, that it must consider whether supplementation is required. And unlike the approval of a plan in SUA, the action here is not just the adoption of a program, but its implementation of an ongoing program. And Wildlife Services discusses this in their programmatic environmental impact statement summary at ER 41. It also continues to tier all of its site-specific documents to this programmatic environmental impact statement. So it's using it. Wildlife Services also acknowledges in its brief that it's still guided by its decision-making model that's in its programmatic environmental impact statement to decide what methods to use, if it's lethal or non-lethal, if it's TRAPS or M44s. Did you want to save your remaining time? Yes, Your Honor. I have about six and a half minutes. Thank you, Your Honor. Good morning. Emily Polachek on behalf of the United States. I think that in this case it might be helpful to go back and look at the relationship that actually happens between APHIS and the state of Nevada in terms of what APHIS actually does with predator damage management. First of all, it's crucial to understand that the state of Nevada bears the primary responsibility for managing its own resident wildlife. Like education, management of resident wildlife is a function that's reserved to the police powers of the state. But do you mean like as a theoretical matter or do you mean on the ground? Nevada is not running its own wildlife management program, is it? Nevada has primary responsibility for management of its wildlife. So what it has done in this case is it has made the decision, Nevada has made the decision, that it wants to manage predator damage and it has asked APHIS to come in and lend its expertise to that function. And in doing so, APHIS does not act alone. APHIS has teamed up with state agents and they work together. But APHIS is supervising the effort and providing the funding or at least a lot of the funding, correct? Part of the funding, it's not necessarily a lot. It breaks down to about 60% of the entire funding when taking all of the different funding sources from federal agencies. But it's also important... Is 40% of the funding coming from the state? I believe it's the state and some, a very small part from some private. It's unclear where. It's a different, something that's not the state, but it's mostly of that 40% is from the state. And so if 40% of the money were spent, a lot less wildlife would be killed, right? Well, okay, and again, with respect to how much wildlife is killed, it's important to also understand that APHIS isn't necessarily going out there and APHIS acting as part of the Nevada Wildlife Services Program, which is this joint program that contains both federal and state agents who are out there working together. They're not out there trying to just kill as many wildlife as they can. They're trying to solve problems. So, for example, with ravens. Ravens are a problem at landfills because they tend to congregate on the garbage trucks as they come in. They take garbage away from the landfill and drop it in other areas, causing health hazards. The Nevada Wildlife Services Program goes out and tries to remedy that problem. So how many birds they take is a function of how big the problem is, not necessarily that they're trying to fulfill a quota. They have a take limit under their Migratory Bird Treaty Act permit, but they're not trying to just meet a quota for destroying wildlife. They're trying to solve the problems that have been presented by these predators. And it's also important to keep in mind that when APHIS is acting with Nevada, APHIS is not a regulatory agency. It does not have the power, and it simply cannot tell the state how to manage its wildlife. So, for example, the plaintiffs talked about traps and Dr. Moldy's concerns on lands where traps and M44s are used. APHIS doesn't have the power to tell Nevada, you can't use traps in managing your wildlife. But APHIS has the ability to stop doing it, to stop participating in this program, right? You don't deny that one possible outcome of this lawsuit could be that a court could say stop killing any predators in Nevada. That's a possible outcome, right? APHIS has to. APHIS could be enjoined, yes. And so APHIS's participation in the Nevada Wildlife Services Program could end. But in that case, there are state actors who have been working alongside the federal actors who could continue those actions. So this isn't that the state is coming in and setting up a whole new program. This is that the state is simply continuing on its own. And they may or may not do that, and they may or may not do that at exactly the same level or in exactly the same way, right? That's true. However, we do have in the record a letter from the director of the Nevada Department of Wildlife saying that it's a priority for them and that they have a statutory responsibility to continue managing predator damage in Nevada. So it was reasonable for the district court to believe that that is what would continue, that Nevada would take up that responsibility on its own. But couldn't there at least be a delay? I mean, so the plaintiffs are saying, we're injured by the fact that we like to view these wildlife and these predators are getting killed currently mostly by APHIS. And so if APHIS were blocked by this lawsuit, Nevada says that they would do the same thing. But isn't it possible that there would be delay in them getting their act together or getting their funding or they would decide to do it differently or even that these plaintiffs would sue Nevada then? Aren't all those things possible? And in the meantime, couldn't that help their injury of ravens being killed? All of those things are possible. Whether that would help the injury here that Dr. Moldy has alleged is the diminishment in his ability to view coyotes and ravens in the wild. Now, coyotes and ravens are unlike cougars in the goat ranchers' case in that they're quite abundant in Nevada. And the idea that the difference between the amount of take that would occur under the joint APHIS state program and a state-only program, that's still quite speculative. Well, it makes a lot of sense, though, right? That if you kill fewer predators, there are going to be more of them around? Well, but the numbers that we're talking about here, you know, the EA says that the estimated raven population in Nevada is in excess of 100,000 birds. A more recent count from a third-party, Partners in Flight, which was cited on NDAL's website, says that there's approximately 190,000 ravens in Nevada at this point, so another 80,000. The amount that Nevada... Is there any case, any standing case where a court has said, because there are a lot of the wildlife that you're interested in, you can't have an injury by anyone killing some of them? Well, not necessarily with wildlife, but there's an analogy to be found in one of the Nuclear Regulatory Commission case where there was a truck driver in that case who said that he was harmed by the possibility that he may have to transport unregulated nuclear material, and the court said that standing... That it was not sufficient to establish standing because he didn't specify how the threat to his health would change because of the difference. Because the court actually thought the regulation was helping him, right? The court thought that he wasn't hurt by this at all, it was actually helping him. Correct. But the court was saying that you need to explain how the change between these two different standards is going to directly affect you. But there it was because there was going to be more protection of him. Here they're saying, we like to see ravens, and this program is killing them. Well, I mean, I think that the principle can still translate, and then I would also point the court to its decision in Washington Environmental Council versus Bellin, which dealt with greenhouse gas emissions, and there the court, in talking about the plaintiffs were suing to enforce some greater standards on oil refineries, and the court... But there the defendant was such a small contributor that the court said it didn't even cause any harm. Here you've already told us that AFIS is at least 60 percent of the funding and participating largely in this alleged harm, right? Well, but I would submit that plaintiffs have not connected the dots between the diminishment in the opportunity to view ravens and coyotes in the wild and what AFIS is actually doing. They're not just going out and killing wildlife, they're solving problems. So, for example, if Dr. Moldy had said, I like watching the ravens descending on these garbage trucks at landfills, and that's one of my great pleasures in life, then yes, he might have been... That's a more... That connection there between the relief requested in joining AFIS's actual activities at the landfill and his alleged harm are... That's a much stronger connection. Here it's just... He doesn't have to see them at the landfill, does he? Well, but the point is that he... We're talking... AFIS takes approximately... I mean, they're allowed to take 2,500 ravens. There are 190,000 ravens in Nevada. The idea that the difference between the amount of ravens that the state would take and the amount that the state and the federal government take together, that that's sufficient to materially affect his ability to see ravens, that's... It's just not true. I mean, in this... And that materially affect language comes from this court's decision in goat ranchers. So aside from ravens, I mean, another one of his complaints is that there are these traps, I think for coyotes, out on the trail, and they hurt his dog, or he's worried they're going to hurt his dog. Why... How is that not an injury from this program that if they reconsidered their methods, they might stop using traps, they might use some other method? That's a procedural claim that he might be able to make. Again, AFIS might be able to reconsider its decision, and not use traps. But the State of Nevada can. The State of Nevada is allowed to continue using traps. But we don't know that they would. They're not doing it on their own right now. Why can't he... So the problem I had with this case when I read your brief the very first time is, okay, I have twins. If my twins are both making noise when I am on the telephone and I want them to stop, can't I start by saying to one twin, please be quiet? And if that twin says to me, there's no point in me being quiet because my brother is making noise, and then I say to the brother, please be quiet, and he says, well, I'm not going to because my sister is still making noise. It's like an endless loop. And that's what your brief seems like to me. Can you explain why that's not really the point of your brief? Well, I mean, the point is that there is a third-party actor who is not a party to this case who has the broad and legitimate discretion to continue this activity. This is a management of its own wildlife is something that has been specifically left to the State. And it has indicated in a letter from its, at the time, director, that it would continue to do so even if AFIS wasn't joined. Say they had tried to sue the State at the same time for an injunction. Would you have been here saying it's speculative because they don't actually have their own program? What if they'd sued both defendants? In that case, then it would be a very different, I mean, yes, then in that case it would be remedied because there would be nobody out there doing predator damage management. So if they had sued both at once, you would have said, in this lawsuit, if they had named the State as a defendant, you would say no problem for standing, we're fine here. Assuming that they were seeking to enjoin both the State and the Federal. And so why can't they do that in steps? Why can't they sue AFIS first because AFIS is leading this effort right now and then, depending on what happens, sue the State later? Or lobby the State? If the State ends up having to take over, why can't they have a different effort against the State as the next step, like my second twin? Well, I mean, they certainly could, but the point is that the State, in the meantime, would be free to continue these activities. And this is not that the State is coming in and setting up a new program. This is that the State is out there right now, acting right alongside the Federal workers. I mean, this is both State and a Federal program, and they're both out there doing the same activities. So it's not a stretch to say that the State would continue, especially given the fact that the agency at issue, the State agency at issue, has indicated it would continue these activities. Let me ask you, because Guardians is alleging procedural injury, and I know you've been trying to address that, but there's a specific statement that the district court made with respect to it, and I'm just trying to figure out if you concede whether or not the district court erred into finding Dr. Mould's, I guess, injury as viewing fewer predators in Nevada. Was the district court correct in describing Dr. Mould's injury in that way? Yes, and I believe that is true. Well, because it seems like the injury here is that Wildlife Services did not conduct a thorough enough investigation and relied on what they allege is stale data. Yes, that may be the injury, but, you know, under Summers and, you know, subsequent cases, it's important that a procedural injury must be accompanied by a concrete harm. And so perhaps the district court might have been more correct in saying that his alleged harm in this case. But that's what I'm trying to figure out, if the district court actually understood what the procedural injury argument was that was being asserted here. And it just makes me... I just wanted to see if you had any comments on that. I think that, you know, in the case law, the terms are used interchangeably with harm, you know, the concrete harm versus the injury, and that kind of brings up the relaxed redressability argument. And the relaxed redressability standard simply does not apply here, because what the relaxed redressability standard says is that a plaintiff can establish redressability by showing that the requested relief could cause the agency to act in a way that would redress the harm. Now, here, the requested relief could cause the agency to go back and reconsider its NEPA, but that would not address the alleged harm because the State of Nevada could continue the damage here. So it's the relaxed redressability standard is simply an opposite in this case. I'd like to turn to the arguments regarding Claims 1 and 2, which this Court previously addressed. I'm sorry, the arguments what? Concerning Claims 1 and 2 with the programmatic EIS. Here, the Claim 1, it's clearly a broad programmatic challenge to the PEIS, the programmatic EIS, which the Supreme Court said is impermissible in Lujan v. National Wildlife Federation. The plaintiff suing under the APA cannot seek wholesale improvement of a program by court decree. It must challenge a specific agency action. And here, if you look at the way that the claim has been framed in the complaint, there's no identified discrete agency action. Now, plaintiffs have attempted to clarify that in briefing both before the district court and this Court. However, this Court has said that claims to dismiss under 12b-6 should be viewed on the complaint itself and not post hoc clarifications. Additionally, to the extent that plaintiffs now arguing that it's this letter that the communication that was exchanged between the parties, the letter from APHIS does not say we're not going to supplement the PEIS. It says that we are going to continue to consider the comments that you've made in our future implementation actions. In ONRC action v. BLM, this Court addressed an identical letter and said that that was merely an informative letter. So there's no final agency action in your view? Correct. Correct. And then with respect to Claim 2, SUA is directly on point here. A land use plan is a broad programmatic discussion about how land is going to be used in the future. In SUA, the Supreme Court explicitly considered the fact that there would be future implementation decisions made. And not only do they have to — Here, the PEIS is sometimes incorporated by reference. In SUA, future implementation decisions have to be in compliance with the land use plan. So the direct connection between a land use plan and future implementation decisions was much stronger in SUA than it is here. And what we have here is a PEIS that looked at 13 different ways to different approaches to wildlife damage management. And the record of decision here took five of those and said that we're sending these forth to local decision makers for consideration in future action-level projects. So nothing is — the PEIS did not authorize any on-the-ground action. There's nowhere in the United States where APHIS is conducting wildlife management operating only under the PEIS. There's some sort of local — But the local plan incorporated by reference and used the programmatic PEIS, right? It does incorporate by reference in the same way that it might reference another study. And in doing — and that's the other important thing to keep in mind is that we're not — APHIS is not relying on old data here. In doing a site-specific EA in this case, they also brought in new information, and they used that information to supplement the knowledge that is in the PEIS. I mean, the PEIS is just one of many programmatic documents that's referenced in the EA. There's no necessarily reliance on it. It's — But if they had redone the programmatic PEIS and it said something totally different, like never use traps, couldn't that — that would affect what happened at the state level, right? In the state — in the — not the state level, I mean the federal, local, Nevada plan. If they had supplemented the PEIS, I suppose, yes. If — Because they're trying to get you to supplement the programmatic one, and then the state Nevada plan is incorporating the federal big national one by reference and using its data. If this federal one changed, which is fundamentally what they're trying to get here, then the local one will change too if it's based on it, right? Sure. But what a failure to supplement claim requires is that there is some mandatory action that must occur. And here there's no — I mean, APHIS is not required to supplement its PEIS because there's no federal action that remains under the PEIS. It's sometimes referenced in the same way that you take a dictionary off the shelf and use it and put it back, but it's not being used to implement on-the-ground activities. There's no on-the-ground activities that are the result of the PEIS specifically. And that — Well, it's one of the causes of the on-the-ground activities, right? It's one of the inputs into the decision-making of the on-the-ground activities. Sure. In conjunction with, you know, the entire bibliography in the EA is part of those on-the-ground activities. But it's — the PEIS is not a program or anything that is implemented on the ground. It's just — these are five approaches. Here, take these, use them as you will, and do local NEPA on that. And so, for that reason, there's no federal action that remains under the PEIS. I'm not sure if we want to talk about jurisdictional discovery in one minute or — Any questions on that? No, I think that was well brief. Thank you. Great. Thank you. Your Honors. A couple of points. First of all, Wildlife Services, I believe, is mischaracterizing its role in implementing the Nevada Plan. Wildlife Services supervises employees of the Nevada Division of Resource Protection, which is actually separate from the Nevada Division of Wildlife. But it's implementing its federal decision, and it's choosing what methods to use on the ground, when to use them, and how to use them. And it is also using methods that if Wildlife Services goes away, these state employees of Nevada Division of Resource Protection can't use DRC 1339 anymore. They'd have to take steps to get a permit to use M44s. So this is not some — you know, just where name badges would change from federal to state employees. Second, this is not just about the animals killed in Nevada, but the methods used. In Dr. Molde's injuries regarding traps and M44s, his declaration also talks about witnessing aerial gunning of coyotes out of helicopters and how that decreased his recreational enjoyment of the Humboldt National Forest. But most importantly, this is about the environmental analysis that Wildlife Services must do to comply with its obligations under the National Environmental Policy Act. We want Wildlife Services to go back and take a hard look at the use of their traps and other methods that it uses. And as you'll see on page 127 of the record, it didn't do its own analysis on the safety of these methods, on, you know, even if these methods work, on what, you know, the cost of the methods. Aerial gunning is a very, very — you know, shooting coyotes out of airplanes is very expensive. Instead, it fully relied on the risk assessment from the Programmatic Environmental Impact Statement. Finally, I would add that, you know, in nuclear resources, the nuclear resources case is like the twins. There were two identical rules, and they were both causing the plaintiff's injury. So if you removed one, there would be no change. And that's the — with these third-party actor cases, the question, in fact, is whether or not they would — a third-party actor would change their conduct as a result of the government's — but that is not the case here. I'd also like to add that Bellin is a substantive rights case and that this court in salmon spawning — there, in salmon spawning, there was — the United States had entered into a treaty with Canada involving the amount of take that salmon — the amount of take that the fishermen could do of salmon. And the injury was really about the Canadian fishermen, what the plaintiff felt was taking too many salmon. And even though there was this third-party actor that could have continued on, the court applied the relaxed redressability requirement and asked whether the agency's decision could be influenced by the environmental considerations that NEPA requires. And that's the question here. Finally, I'd like to add that even if the facts — excuse me, Your Honor — but I also — finally, that the EA in this case tiers to the programmatic environmental impact statement and it doesn't do the full analysis. Finally, the facts of this case are really clear, that Wildlife Services is implementing its own plan, it's poisoning ravens with DRC-1339 that only the federal government can use, it's killing coyotes with M44 cyanide capsules that Nevada doesn't have a permit to use, and that Nevada doesn't have its own plan to kill wildlife and it cannot implement an equivalent plan. It continues to use the programmatic environmental impact statement for its ongoing program, both in Nevada and nationwide. And the programmatic environmental impact statement says that it applies to Wildlife Services' ongoing national program. Are there — unless there's other questions. Okay. Thank you so much, Your Honors. Thank you. I'd like to thank both of you for your arguments this morning. The case just argued is submitted and we're adjourned for the morning. All rise. This court for this session stands adjourned.
judges: McKeown, Murguia, Friedland